UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────

№ 04 Civ. 8236 (RJS)

───────────────

JESSICA GALIMORE,

Plaintiff,

VERSUS

THE CITY UNIVERSITY OF NEW YORK BRONX COMMUNITY COLLEGE,

Defendant.

───────────────

MEMORANDUM AND ORDER
July 1, 2009

───────────────

RICHARD J. SULLIVAN, District Judge:

*Pro se* Plaintiff Jessica Galimore ("Galimore" or "Plaintiff") brings this action against the City University of New York Bronx Community College ("BCC" or "Defendant") alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff contends that Defendant discriminated against her on the basis of her race and national origin, created a hostile work environment, and retaliated against her for engaging in conduct that is otherwise protected by these laws.

Before the Court is Defendant's motion for summary judgment as to each of Plaintiff's claims. For the reasons set forth below, Defendant's motion is granted and this case is dismissed.

I. BACKGROUND

A. Facts

The following facts are taken from the Parties' Local Rule 56.1 Statements, the affidavits submitted in connection with the instant motion, and the exhibits attached thereto. The facts are undisputed unless

otherwise noted. Where only one Party's 56.1 Statement is cited, the facts are taken from that Party's statement, and the other Party does not dispute the fact asserted or has offered no admissible evidence to dispute that fact. Cognizant of Plaintiff's pro se status, the Court has independently reviewed the record in this case. The Court recites only those facts relevant to the disposition of Defendant's motion.

### 1. Plaintiff's Employment

Plaintiff, a "[b]lack, African-American female" (Pl.'s 56.1 ¶ 3), was employed as a Career Development Specialist[1] at BCC for a period of ten months, from August 9, 1999, through June 30, 2000. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) Plaintiff was interviewed for this position by, *inter alia*, Career Development Director Melba Olmeda ("Olmeda"), an Hispanic female, and Transfer Officer Michael Roggow ("Roggow"), a white male. (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4; *see also* Barker Decl. Ex. G, Transcript of July 27, 2007 Deposition of Jessica Galimore ("Galimore Dep. Tr.") at 53.) Plaintiff initially worked in BCC's Career Development Office, which is a part of BCC's Division of Student Development. (*See* Pl.'s 56.1 ¶ 2.)[2] Olmeda served as Plaintiff's supervisor within the Career Development Office. (*See id.*) In March 2000, Plaintiff was reassigned to the Transfer Center at BCC. (Pl.'s 56.1 ¶ 14; Galimore Decl. Ex. K.) Plaintiff's employment with Defendant terminated on June 30, 2000. (Galimore Decl. Ex E.16.)

### 2. The Allegedly Actionable Conduct

Plaintiff's claims for discrimination, retaliation, and hostile work environment are predicated on Defendant's conduct during Plaintiff's employ at BCC, which Plaintiff testified about during her deposition. The Court will discuss this conduct in three parts: (1) the comments pertaining to Plaintiff's racial background; (2) the alleged disparate treatment of similarly situated individuals; and (3) the harassment that Plaintiff suffered while working at BCC.

### i. Comments Pertaining to Plaintiff's Racial Background

Plaintiff, during her deposition, identified four instances during which Olmeda made comments pertaining to Plaintiff's racial background.[3] Plaintiff first testified that race was mentioned during her initial interview. Specifically, Plaintiff testified that "[w]e were talking about culture stuff during the interview. I remember speaking about Puerto Rico there. . . . [C]ulture and race was in our discussion." (Galimore Dep. Tr. at 150.)

---

[1] Plaintiff's precise job title has been referred to as "Career Development Specialist," "Assistant to Higher Education Officer," and "Career Development Advisor." (*See, e.g.*, Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) Since each job title refers to the same description of Plaintiff's duties at BCC, the Court will refer to Plaintiff throughout this Memorandum and Order as "Career Development Specialist." (Pl.'s 56.1 ¶ 1.)

[2] Plaintiff was one of only three African Americans working in the Career Development Office (Pl.'s 56.1 ¶ 2). However, the Division of Student Development consists of a faculty and a staff with an ethnic distribution of 46% African American, 39% Hispanic, and 16% White/Asian/Other. (Def.'s 56.1 ¶ 2 ; *see also* Barker Decl. Ex. F at 2.)

[3] Plaintiff was asked at her deposition, "[a]pproximately how many times did [Olmeda] make comments to you about your racial background, your ethnic background?" (Galimore Dep. Tr. at 149.) Plaintiff responded "approximately five but I'm not a hundred percent sure. I don't remember specific events." (*Id.*) The Court, after independently reviewing the entire record, was only able to locate four instances in which Plaintiff testified that Olmeda made comments about Plaintiff's racial background.

Second, on or around August or September 1999, Olmeda allegedly engaged Plaintiff in a conversation about her race. (*Id.* at 84.) Plaintiff testified that Olmeda expressed surprise upon learning that Plaintiff was not "Latina." (*Id.*) Plaintiff further testified that Olmeda "said [Plaintiff] need[s] to be proud of who [she is]," that Plaintiff responded, "I'm not Latina," and that Olmeda replied, "[p]eople like you really make me upset because I'm a dark skin[ned] Puerto Rican and most people are light skin[ned] Puerto Rican and they want to be white." (*Id.*)[4] Olmeda also "talked about stigmatization, being a dark skin[ned] Puerto Rican, [and] what her experience was." (*Id.*)

Third, Plaintiff recounted an incident involving Cassandre Bellabe ("Bellabe"). (*Id.* at 85-86, 150.) Bellabe was "a black woman," "from Haiti," and "was one of the other staff. She didn't work in [Plaintiff's] department. [Plaintiff did not] know what her title was but she facilitated certain workshops for students. . . . [S]he was a staff [member] who [was] asked by the career development to provide services and come in and do workshop for some of her classes." (*Id.* at 86.) Plaintiff testified at her deposition that there was an incident involving Bellabe's facilitation of a workshop involving Plaintiff. (*Id.* at 85.) Specifically, Plaintiff testified that Olmeda "perceiv[ed] [Plaintiff] and [Bellabe] [as] working together because we are quote of the same ancestry." (*Id.*)[5]

Fourth, Plaintiff testified that Olmeda said "I'm not going to let [a] black girl make me look bad." (*Id.* at 96.) Plaintiff does not specify a date for when this statement was made.

ii. The Alleged Disparate Treatment of Similarly Situated Individuals

Plaintiff also testified that she was treated differently than two non-African-American colleagues who also worked under Olmeda's supervision: Career Development Coordinator Driada Rivas-Vallieres ("Rivas-Vallieres"), an Hispanic female, and Employment Specialist Michael McShea ("McShea"), a legally blind white male. (*See* Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶¶ 16-18.) Specifically, Plaintiff testified at her deposition about four instances of alleged disparate treatment. First, Plaintiff testified that Rivas-Vallieres was given the opportunity to write Olmeda a rebuttal to improve her performance evaluation, whereas Plaintiff was not allowed any modifications in her own performance evaluation. (*See* Galimore Dep. Tr. at 87.) Second, Plaintiff testified that Olmeda reprimanded her when she was forced to cancel a workshop, but did not reprimand Rivas-Vallieres when she cancelled a workshop. (*See id.* at 88.) Third,

---

[4] Plaintiff appears to provide a similar, but varying, account of this conversation in her 56.1 statement. (*See* Pl.'s 56.1 ¶ 5.) The Court does not consider these, or any of Plaintiff's other unsworn allegations for the purposes of this Memorandum and Order. *Cf. Dukes v. City of New York*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion."). Defendant has complied with Rule 56.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York by providing Plaintiff with the required "Notice To *Pro Se* Litigant Who Opposes a Motion For Summary Judgment." (Doc. No. 26.) That Notice explicitly informs Plaintiff that she may not rely solely upon her unsworn allegations, but must submit sworn affidavits to defeat Defendant's motion for summary judgment. Given Defendant's compliance with Local Rule 56.2, the Court finds that there is no prejudice in not considering Plaintiff's numerous unsworn allegations.

[5] It is not clear from Plaintiff's deposition testimony whether this incident involved Plaintiff's "perception" of Olmeda's reaction, or an actual quotation by Olmeda. For purposes of this Memorandum and Order, the Court assumes that Olmeda made an actual statement that two people "of the same ancestry" were "working together."

3

Plaintiff testified that Olmeda reprimanded her for arriving late to work during a snowstorm, but did not reprimand other employees, including Rivas-Vallieres and McShea. (*See id.* at 76-77.) And fourth, Plaintiff testified that she was reprimanded for having folders on her desk, while her colleagues were not. (*See id.* at 88-89.)

### iii. Alleged Harassment

Finally, Plaintiff alleges that she was exposed to an "abusive environment" at work. (*Id.* at 90.) Specifically, Plaintiff testified that Olmeda would "slam the door [and] look at [Plaintiff] when [Plaintiff] was coming down the corridor," and that Olmeda "would peek out of the office" (*Id.*) When Plaintiff "was going to the ladies' room, [Olmeda] would look at [Plaintiff] and try to intimidate [Plaintiff] with her statement, 'hm-hm.'" (*Id.* at 95; *see also id.* at 118.) Plaintiff also testified that "there w[ere] a few occasion[s] that I had interacted with [Olmeda] in the corridor by her rolling her eyes at me, sucking her teeth at me, [and] brushing close by me." (*Id.* at 149; *see also id.* at 118.) Plaintiff also swore that Olmeda stated on repeated occasions, "[w]hat am I going to do with you?" and "I'm going to deal with you." (*Id.* at 82, 85, 95-96.)

Plaintiff also testified at her deposition about behavior that she did not attribute to Olmeda or to any one particular person. Specifically, Plaintiff testified that, while at work, unknown people would (1) call Plaintiff on her work telephone and then hang up (*id.* at 93); (2) knock on the door of Plaintiff's office (*id.* at 95); and (3) open and close Plaintiff's door while Plaintiff was sitting at her desk (*id.*). Plaintiff also testified that her car was vandalized while it was parked on the BCC campus, although she did not know who was responsible for the act of vandalism. (*Id.* at 92.)

### 3. Plaintiff's Job Performance and Termination

As noted, Plaintiff was employed at BCC for a period of ten months, from August 9, 1999, through June 30, 2000. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) Plaintiff was absent twenty-three days and late to work several times without prior supervisory approval. (*See* Def.'s 56.1 ¶¶ 10-12.) Plaintiff also received negative job performance evaluations, and students made complaints concerning Plaintiff's performance. (*See* Def.'s 56.1 ¶¶ 13, 15.) Plaintiff concedes that she was reprimanded by Olmeda for multiple incidents after September 1999, but alleges that the reprimands were unwarranted. (*See* Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9; Galimore Dep. Tr. at 89.)

Plaintiff alleges that she alerted BCC's Vice President of Student Development, Brenda A. Scranton ("Scranton"), a black, African-American female, about her conflict with Olmeda. (*See* Pl.'s 56.1 ¶ 9.) In support of this allegation, Plaintiff has introduced into the record a document entitled "Items to discuss with VP Scanton [sic] 2/8 @ 4:00 pm," and a letter to Scranton from Plaintiff dated March 2, 2000. (Galimore Decl. Ex. E.23.)

On March 2, 2000, Plaintiff alleges that Vice President Scranton called her and suggested that she meet individually with BCC Campus Union Representative Peter Hobberman and Dean Jennifer Misick to learn about how to "handle working with [Olmeda]." (*See* Pl.'s 56.1 ¶ 9.) After meeting with Hobberman, Plaintiff alleges that she began the internal grievance process with the BCC campus union. (*See id.*)

4

On March 3, 2000, Olmeda issued an inter-office memorandum to Vice President Scranton indicating that "Jessica Galimore will receive an unsatisfactory performance evaluation." (*See* Galimore Decl. Ex. E.12). The March 3, 2000 memorandum also recommended that Plaintiff not be reappointed to her position. (*See id.*)

As predicted by Olmeda, Plaintiff received an overall "unsatisfactory" performance evaluation, which was signed by Olmeda and Plaintiff on March 7, 2000. (*See* Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8; Barker Decl. Ex. O.) In the performance evaluation, Plaintiff received "unsatisfactory" and "average" scores when compared to other BCC employees in similar positions. (Barker Decl. Ex. O.) Specifically, Plaintiff received an "unsatisfactory" grade in eight areas, and an "average" grade in three areas. (*See id.*)[6] In response to a question on the evaluation regarding Plaintiff's strengths as an employee, Olmeda wrote that Plaintiff "[h]as good results when working together on projects with other professional staff members" and seems "to enjoy doing classroom presentations." (*Id.*) In response to a question regarding areas in need of development and suggested means for development, however, Olmeda wrote that Plaintiff should:

[i]nclude more effective and regular communications with [Olmeda] and other staff members, particularly when she is unable to or having difficulties with assignments and responsibilities. Increase her efforts to comply [with the] rules and polices of the office/college without consistent verbal or [written] resistance. Must improve on her interpersonal skills and relationships with professional and other employees including college work study students and college assistants. Must be willing to accept constructive criticism and meet with [Olmeda] on a regular basis to improve and clarify the expectations and performance of her job.

(*Id.*)

By memorandum dated March 9, 2000, Plaintiff submitted a rebuttal in response to the March 7, 2000 performance evaluation, in which she indicated that, "I have very strong reason to believe that my evaluation was based on personal issues rather than professional performance reviewing [sic] a six month period." (Galimore Decl. Ex. E).

On March 21, 2000, Plaintiff wrote a memorandum to Vice President Scranton in which she reiterated her concerns about working with Olmeda. (*See* Pl.'s 56.1 ¶ 14.) On March 23, 2000, Vice President Scranton informed Olmeda that Plaintiff was being assigned to BCC's Transfer Center under Vice President Scranton's supervision. (*Id.*) (*See* Pl.'s 56.1 ¶ 14; Barker Decl. Ex. F at 2; Galimore Decl. Ex. K.)[7]

---

[6] Plaintiff received "unsatisfactory" grades in the following areas: "decision making ability," "planning and organizing ability," "problem-solving ability," "communications ability," "adaptability and flexibility," "creativity, initiative, resourcefulness," "relationship with others," and "dependability." (Barker Decl. Ex. O.) Plaintiff received "average" grades in the following areas: "productivity," "knowledge," and "acceptance of responsibility." (*Id.*) Plaintiff received a mixed grade of "unsatisfactory" and "average" in the area of "personal factors." Plaintiff received a grade of "not applicable to job" in the following two areas: "leadership ability" and "training ability." (*Id.*)

[7] Despite being transferred, Plaintiff alleges that Olmeda still assigned Plaintiff tasks and continued her "intimidation tactic[s]," such as "rolling her eyes at [Plaintiff], sucking her teeth at [Plaintiff], [and] brushing close by [Plaintiff]." (Galimore Dep. Tr. at 149.)

On March 24, 2000, Plaintiff allegedly met with Vice President Scranton. (*See* Pl.'s 56.1 ¶ 12.) At this meeting, Plaintiff alleges that Vice President Scranton showed her three inter-office memoranda, dated March 9, 2000, March 10, 2000, and March 15, 2000, respectively, that were addressed to Plaintiff and written by Olmeda. (*See id.*; *see also* Galimore Decl. Ex. F.) Plaintiff alleges that she had not seen these three memoranda prior to the March 24, 2000 meeting with Scranton. (*See* Pl.'s 56.1 ¶ 12.) In the memorandum dated March 9, 2000, Olmeda indicated that, despite requesting that Plaintiff post signs advertising a BCC job fair on March 8, 2000 "immediately," Plaintiff had failed to do so. (*See* Galimore Decl. Ex. F.) In the memorandum dated March 10, 2000, Olmeda stated that she met with Plaintiff again on March 9, 2000 regarding "ways to increase student registration and their preparedness for the upcoming job fair," but that Plaintiff failed to adhere to Olmeda's requests following the March 9, 2000 meeting. (*See id.*) In the memorandum dated March 15, 2000, Olmeda reported that Plaintiff was late to work on March 9, 2000, absent from her desk for prolonged periods on March 13, 2000, late again on March 14, 2000, and absent from her office for student advising on March 15, 2000. (*See id.*)

On March 29, 2000, BCC President Carolyn G. Williams, Ph.D., an African-American female, notified Plaintiff by certified mail that she "[would] not be reappointed to [her] position" as BCC's Career Development Specialist effective July 1, 2000. (Galimore Decl. Ex. E.16.) The letter also stated that Plaintiff's "employment at Bronx Community College will terminate on June 30, 2000." (*Id.*) Plaintiff continued working at BCC in the Transfer Center until June 30, 2000.[8]

B. Procedural History

Plaintiff filed a complaint with the New York State Division of Human Rights dated February 20, 2001. (*See* Barker Decl. Ex. E.) Although it is not clear from the documents provided to the Court when Plaintiff filed her claim with the Equal Employment Opportunity Commission ("EEOC"), the EEOC issued a dismissal and a "right to sue letter" on October 21, 2002, in which the EEOC stated that it had "adopted the findings of the state or local fair employment practices agency that investigated this charge." (Barker Decl. Ex. A.) On July 8, 2004, the EEOC issued a letter to Plaintiff, indicating that Plaintiff "stated [that she] never received the [October 21, 2002] dismissal, [and that the EEOC] record shows that it was returned unanswered." (Barker Decl Ex. B.) The July 8, 2004 letter further provided that "you will find the original envelope that [the October 21, 2002 dismissal] was mailed in showing that it was returned back to our office." (*Id.*) Plaintiff alleges that she did not actually receive her right to sue notice until July 12, 2004. (Pl.'s 56.1 ¶ 29.)

Plaintiff commenced this action by filing a complaint on October 19, 2004. (Doc. No. 2.) Defendant filed its answer on February 28, 2005. (Doc. No. 4.) The case was initially assigned to the Honorable Kenneth

---

[8] On May 30, 2000, Plaintiff's immediate supervisor in the Transfer Center, Michael Roggow, issued a memorandum to Vice President Scranton that recommended that Plaintiff's contract not be reinstated because, *inter alia*, Plaintiff had attendance problems, came to work and meetings late without any notification, disappeared during the day, became hostile and defensive during discussions, and failed to show professional respect to her colleagues. (*See* Barker Decl. Ex. F.7.)

6

M. Karas, District Judge, and was subsequently reassigned to the undersigned on September 4, 2007. (Doc. No. 17.) After the completion of discovery, on January 24, 2008, Defendants moved for summary judgment as to all of Plaintiff's claims. (Doc. No. 25.) Plaintiff filed her opposition on April 3, 2008 (Doc. No. 34) and the motion was fully briefed on May 6, 2008 (Doc. No. 33).

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson*, 477 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Rivkin v. Century 21 Teran Realty LLC*, 494 F.3d 99, 103 (2d Cir. 2007). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)); *see also Giarratano v. Edison Hotel*, No. 08 Civ. 1849 (SAS), 2009 WL 464441, at *4 (S.D.N.Y. Feb. 24, 2009) ("Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little or no evidence of discrimination." (internal

7

quotation marks and citation omitted) (alteration in original)).

In deciding Defendant's motion for summary judgment, the Court is mindful of the fact that the submissions of a litigant proceeding *pro se* should be held "'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003); *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). Nonetheless, "proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### III. DISCUSSION

#### A. Statute of Limitations

As an initial matter, Defendant argues that Plaintiff's claims are barred by the applicable statute of limitations.

A Title VII claimant must file her complaint not more than 90 days after receipt of a "right to sue" letter from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1). With respect to a *pro se* litigant, a complaint is considered timely if the court's *Pro Se* Office receives the complaint before the expiration of the applicable limitations period. *See Ortiz v. Cornetta*, 867 F.2d 146, 147-48 (2d Cir. 1989); *Toliver v. County of Sullivan*, 841 F.2d 41, 42 (2d Cir. 1988). A delay in "filing" should not work to Plaintiff's disadvantage, at least where *in forma pauperis* relief was granted. *See Toliver*, 841 F.2d at 42.

In this case, after an apparent mailing address error, the EEOC sent its "right to sue" letter to Plaintiff on July 8, 2004. Plaintiff alleges that she received it on July 12, 2004. Plaintiff submitted her "right to sue" papers and her complaint to the *Pro Se* office on September 9, 2004. Plaintiff's *in forma pauperis* application was granted on October 15, 2004, and her case was issued a docket number on October 19, 2004. Consequently, under *Toliver*, the Court deems Plaintiff's claims to be timely.

#### B. Race Discrimination Claim[9]

##### 1. Applicable Law

Since Plaintiff has not presented any evidence directly reflecting discriminatory animus, the Court reviews Plaintiff's discrimination claims under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

In the first step of this framework, the employee bears the initial burden of producing evidence sufficient to support a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis*." *See*

---

[9] Plaintiff also claims discrimination based upon national origin, which she claims is American. Insofar as Plaintiff has introduced *any* evidence in support of this contention, the Court finds that this claim is indistinguishable from her claim for discrimination based upon her race, and accordingly, dismisses Plaintiff's claim for discrimination on the basis of national origin for the same reasons articulated below.

8

*e.g.*, *Woodman*, 411 F.3d at 76; *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). To establish a *prima facie* case of discrimination, a plaintiff must show (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000).

Second, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the [adverse employment action].'" *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)).

Third, if the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. (internal quotation marks omitted). To meet this burden, Plaintiff may rely on evidence presented to establish her *prima facie* case, as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that she satisfies the "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of Plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

2. Analysis

For the reasons set forth below, the Court grants Defendant's motion as to Plaintiff's race discrimination claim brought pursuant to Title VII.

i. Step One

The Court finds that Plaintiff has satisfied the first three prongs of the *prima facie* standard under *McDonnell Douglas* with regard to her race discrimination claim.[10]

Whether Plaintiff has satisfied the fourth prong of the *prima facie* standard, showing that the adverse employment actions at issue in this case occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's race, merits a discussion from the Court. Plaintiff attempts to establish an inference of race discrimination through two types of evidence: (1) instances of disparate treatment of similarly situated individuals, and (2) the various race-related comments made by Olmeda. The Court will discuss each of these in turn.

---

[10] The Court rejects Defendant's argument that Plaintiff has failed to satisfy the third prong of the *prima facie* standard. Plaintiff's termination is sufficient to show adverse employment action. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2001) (finding that a "materially adverse change might be indicated by a termination of employment" (internal quotation marks and citations omitted)).

9

a. Disparate Treatment

"A showing of disparate treatment — that is, a showing that the employer treated [P]laintiff less favorably than a similarly situated employee outside h[er] protected group — is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). In order to demonstrate disparate treatment, Plaintiff must show that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* (internal quotation marks omitted). "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (citation omitted). The Court thus must determine whether Plaintiff and the asserted comparators are similar in significant respects by considering whether the respective individuals had the same supervisors, were subject to the same performance evaluation and disciplinary standards, and engaged in conduct of comparable seriousness without any differentiating circumstances. *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63-64 (2d Cir. 1997). The question of whether two employees are "similarly situated" is generally a triable issue for the fact finder. *Graham*, 230 F.3d at 39. Nonetheless, a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees. *See, e.g.*, *Hayes v. Kerik*, 414 F. Supp. 2d 193, 204 (E.D.N.Y. 2006); *Spiegler v. Israel Disc. Bank of N.Y.*, No. 01 Civ. 6364 (WK), 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003) ("A court can properly grant summary judgment [on a discrimination claim] where no reasonable jury could find the similarly situated prong met." (citing *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001))).

As noted, Plaintiff points to the treatment of two co-workers, McShea and Rivas-Vallieres, to support an inference of discrimination on the basis of disparate treatment of similarly situated employees. The Court finds that there is a reasonably close resemblance of facts and circumstances between Plaintiff, McShea, and Rivas-Vallieres to meet the low burden of raising a *prima facie* inference of discrimination. First, McShea and Rivas-Vallieres, who are white and Hispanic, respectively, are clearly outside of Plaintiff's protected group. Next, although Plaintiff, McShea, and Rivas-Vallieres each have different job titles, they all reported to the same supervisor, Olmeda. "[W]hether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated. " *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) (collecting cases).

Third, "[i]n order for employees to be 'similarly situated' for the purposes of establishing a plaintiff's *prima facie* case, they must have . . . engaged in conduct similar to the plaintiff's." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999) (internal quotation marks omitted); *see also Campbell v. Alliance Nat'l. Inc.*, 107 F. Supp. 2d 234, 242-44 (S.D.N.Y. 2000). Although Plaintiff has introduced no evidence that McShea and Rivas-Vallieres received the

10

kind of negative evaluations that Plaintiff received, or that they were absent from work as often as Plaintiff, Plaintiff did testify, during her deposition, about several instances of disparate treatment. Specifically, Plaintiff testified that Rivas-Vallieres was given the opportunity to write Olmeda a rebuttal to improve her performance evaluation, whereas Plaintiff was not allowed any modifications in her own performance evaluation (*see* Galimore Dep. Tr. at 87); that Olmeda reprimanded Plaintiff when she was forced to cancel a workshop, but did not reprimand Rivas-Vallieres when she also cancelled a workshop (*see id.* at 88); that Olmeda reprimanded Plaintiff for arriving late to work during a snowstorm, but did not reprimand other employees for the same tardiness, including Rivas-Vallieres and McShea (*see id.* at 76-77); and that Plaintiff was reprimanded for having folders on her desk, while her colleagues were not (*see id.* at 89).[11] Granting Plaintiff all of the inferences to which she is entitled, the Court finds that this evidence is sufficient, barely, to meet the minimal burden of showing disparate treatment for her *prima facie* case.

### b. Verbal Comments

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007). Although courts have often used the term "stray remark" to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term "stray remark" "represented an attempt — perhaps by oversimplified generalization — to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Accordingly, the task is not to categorize remarks "either as stray or not stray," and "disregard [remarks] if they fall into the stray category," but rather to assess the remarks' "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Id.* at 116. Courts in this District have found the following factors relevant to this determination:

> (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

*Silver*, 490 F. Supp. 2d at 363 (citing *Minton v. Lenox Hill Hosp.*, 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2001)); *see also Quinby v. WestLB AG*, No. 04 Civ. 7406 (WHP), 2007 WL 3047111, at *1 (S.D.N.Y. Oct. 18, 2007).

Plaintiff testified about four instances in which race was mentioned by Olmeda during her employment at BCC: (1) at her initial job interview, during which "culture and race" were discussed (Galimore Dep. Tr. at 150); (2) in August or September 1999, when Olmeda told Plaintiff, *inter alia*, that she "need[s] to be proud of who [she is]" (*id.* at

---

[11] Although Plaintiff appears to have testified that, unlike Rivas-Vallieres, she was not given an opportunity to rebut her performance evaluation (*see* Galimore Dep. Tr. at 87), the record clearly indicates that Plaintiff did in fact write a rebuttal to Olmeda's performance evaluation (*see* Galimore Decl. Ex. E).

11

84); (3) an undated incident during which Olmeda accused Plaintiff of "working together" with someone "of the same ancestry" (*id.* at 85); and (4) an undated incident during which Olmeda said "I'm not going to let [a] black girl make me look bad" (*id.* at 96). None of these remarks possess any apparent nexus to the decision-making process. However, these remarks were made by Plaintiff's immediate supervisor, Olmeda, who clearly had some influence over the decision-making process, as evinced through the memorandum that she wrote recommending that Plaintiff not be reappointed. Granting Plaintiff all of the inferences to which she is entitled, the Court finds that these remarks are sufficient to raise a *prima facie* case under *McDonnell Douglas*.

ii. Step Two

Turning to step two of the *McDonnell Douglas* analysis, Defendant has clearly carried its burden of articulating legitimate and nondiscriminatory reasons for termination. Plaintiff received an unsatisfactory performance evaluation and multiple reprimands from Olmeda for continued lateness to work, absences, and failure to adequately perform her work duties. (*See, e.g.*, Barker Decl. Ex. O.) For example, in the memorandum dated March 15, 2000, Olmeda reported that Plaintiff was late to work on March 9, 2000, absent from her desk for prolonged periods on March 13, 2000, late again on March 14, 2000, and absent from her office for student advising on March 15, 2000. (Galimore Decl. Ex. F.) All together, Plaintiff was absent twenty-three days and late to work several times without prior supervisory approval. (*See* Def.'s 56.1 ¶¶ 10-12.) Plaintiff also received negative job performance evaluations, and students made complaints concerning her performance. (*See* Def.'s 56.1 ¶¶ 13, 15.)[12] This evidence is sufficient to establish a legitimate, non-discriminatory reason for Plaintiff's termination. *See Montanile v. Nat'l Broadcast Co.*, 211 F. Supp. 2d 481, 488-89 (S.D.N.Y. 2002) (finding that an employee's frequent absence from her work desk when the employer would call and the employee's refusal to perform her duties are legitimate, nondiscriminatory reasons for termination); *Molokwu v. City of New York*, No. 98 Civ. 5202 (JSM), 2000 WL 1056314, at *2 (S.D.N.Y. Aug. 1, 2000) (finding that excessive absences indicate a legitimate non-discriminatory reason for termination).

iii. Step Three

As noted above, once Defendant has carried its burden, the burden shifts back to Plaintiff to demonstrate that the reasons offered by Defendant were a pretext for discrimination. Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotations omitted). Thus, to defeat Defendant's motion for summary judgment, it is Plaintiff's burden to demonstrate that there is a material issue of fact as to whether (1) Defendant's asserted reason for discharge is false or unworthy of belief and (2) "more likely than not," Plaintiff's race was the real reason for the discharge. *See Faldetta v. Lockheed Martin*

---

[12] Additionally, Defendant provides ample evidence that Plaintiff maintained her poor job performance and absenteeism even when she was transferred to a new supervisor, Michael Roggow, whom Plaintiff concedes never discriminated against her. (*See* Barker Decl. Ex. F at 2.)

12

*Corp.*, No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *8 (S.D.N.Y. Nov. 9, 2000).

The Court finds that Plaintiff has failed to meet her burden here. The only evidence that Plaintiff has adduced is that discussed above in connection with her *prima facie* case. While the Court found that this evidence — specifically, the disparate treatment of McShea and Rivas-Vallieres, and Olmeda's comments pertaining to Plaintiff's race — was sufficient to meet Plaintiff's *prima facie* burden, the Court does not find that this evidence suffices to create a material issue of fact as to whether Defendant's legitimate reasons for not reappointing Plaintiff were "more likely than not" a pretext for racial discrimination.

First, as to the disparate treatment of McShea and Rivas-Vallieres, Plaintiff did not testify that either McShea or Rivas-Vallieres were comparable to Plaintiff in the most significant respect, namely, that either McShea or Rivas-Vallieres were reappointed despite being absent or late from work as often as Plaintiff.[13] If Plaintiff had adduced evidence that co-workers outside of her protected class, with similar performance and attendance records to her own, were not terminated as she was, Plaintiff would have met her burden in raising sufficient evidence to support a rational finding that Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff were pretextual. However, Plaintiff has only adduced evidence that Olmeda reprimanded Plaintiff, but not her colleagues for certain isolated instances, such as, *inter alia*, being late to work once during a snowstorm and having folders on her desk. Such evidence is insufficient to meet Plaintiff's burden here. *Cf. Ford v. Consol. Edison Co. of New York*, No. 03 Civ. 9587 (PAC), 2006 WL 538116, at *17 (S.D.N.Y. Mar. 3, 2006) ("Absent concrete, admissible evidence that similarly situated non-African-American employees were treated differently under identical circumstances, [the p]laintiff's discrimination claims must fail.").

Second, as to the comments made by Olmeda, the Court finds that while the first two comments — the first made during Plaintiff's job interview, and the second made during August or September 1999 — might demonstrate some preoccupation with race on the part of Olmeda, neither the content nor the timing of these two comments supports an inference that Plaintiff's termination was motivated by discriminatory animus. The third comment by Olmeda, accusing two women "of the same ancestry" of "working together," likewise fails to support any inference that Plaintiff's termination was motivated by impermissible means. The final comment made by Olmeda — I'm not going to let [a] black girl make me look bad." (Galimore Dep. Tr. at 96) — does evince a degree of racial animus on Olmeda's behalf. However, Plaintiff's burden at this stage is not to demonstrate that her supervisor made a racially-charged comment, but rather "to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Patterson*, 375 F.3d at 221. Taken collectively, the Court finds that Olmeda's statements fail to demonstrate a sufficient nexus to Plaintiff's subsequent termination. The comments were not made in connection with the decision-making process,[14] and are otherwise not sufficiently pervasive or severe enough, even considered in conjunction with Olmeda's other alleged behavior discussed above in Part I.A.2.iii, to

---

[13] In fact, the record reflects that Rivas-Vallieres has *never* been late to work. (Barker Decl. Ex. I at 86.)

[14] In fact, the first comment was made in connection with the *hiring* process.

13

raise a triable issue of fact as to whether Defendant's stated reasons for terminating Plaintiff's employment were pretextual. *Cf. Campbell*, 107 F. Supp. at 247 ("'Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.'" (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992))). Olmeda's remarks thus fail to raise a material issue of fact that either Defendant's asserted reason for Plaintiff's discharge was false or that, "more likely than not," Plaintiff's race was the real reason for the discharge.

Accordingly, considering all of the evidence in the record and granting Plaintiff all of the inferences to which she is entitled, the Court finds that Plaintiff has failed to meet her burden in adducing sufficient evidence to support a jury finding that Plaintiff was terminated for discriminatory reasons. *Cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001) (upholding grant of summary judgment for employer where, even assuming that the employer's explanations for its decision were partly pretextual, "the evidence presented by [Plaintiff] is not enough to permit a jury to find that the real reason he was fired was his age"). Defendant's motion for summary judgment is therefore granted as to Plaintiff's race discrimination claim.

### C. Retaliation Claim

#### 1. Applicable Law

The Court also reviews Plaintiff's claim for retaliation brought pursuant to Title VII under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas*. *See, e.g.*, *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). To establish a *prima facie* case of retaliation, Plaintiff must show "(1) participation in a protected activity known to the defendant[s]; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (internal quotations omitted); *see also Kessler v. Westchester County Dep't. of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006). As with Plaintiff's discrimination claim, although the burden at the *prima facie* stage is minimal, Plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995).

#### 2. Analysis

##### i. Step One

In this case, Plaintiff has satisfied the *prima facie* standard with respect to her retaliation claim. First, Plaintiff has proffered evidence that she engaged in protected activity by (1) making complaints to Vice President Scranton regarding the purportedly offensive conduct of Olmeda, and (2) filing an internal grievance process with the BCC campus union.[15] For the purposes of this

---

[15] The Court notes, however, that the exact date by which Plaintiff actually made complaints to Vice President Scranton is not clear from the extant record. As noted, Plaintiff has introduced into the record a document entitled "Items to discuss with VP Scanton [sic] 2/8 @ 4:00 pm," and a letter to Scranton from Plaintiff dated March 2, 2000. (Galimore Decl. Ex. E.23.) Plaintiff testified at her deposition that she complained to Scranton sometime "between December and February." (Galimore Dep. Tr. at 98.) Further,

14

motion, these complaints constitute protected activity under Title VII because, viewing the evidence in the light most favorable to Plaintiff, it appears that Plaintiff "had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII" when she lodged complaints regarding the purportedly hostile nature of her work environment. *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (holding that, "[t]o prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII," but only that he held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law"). Plaintiff's complaints also clearly satisfy the "knowledge requirement" of the first prong of the *prima facie* standard. *See, e.g.*, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding that the plaintiff's internal complaints regarding co-workers' offensive comments satisfied the first prong of the *prima facie* standard); *Campbell v. Home Depot U.S.A., Inc.*, No. 03 Civ. 1421 (KMK) (HBP), 2006 WL 839001, at *11 (S.D.N.Y. Mar. 30, 2006) (finding, for the purposes of the first prong of the *prima facie* standard, that "[w]hether or not the individual employees who decided to terminate [the plaintiff] knew of her complaint is immaterial to resolving the knowledge requirement").

Second, it is undisputed that Defendant terminated Plaintiff's employment and that such an action satisfies the adverse employment prong of the *prima facie* standard. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2001).

Accordingly, the Court turns to the third prong of the *prima facie* case: whether there is a causal connection between the protected activity and the adverse employment action. Causation can be proven either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117. Plaintiff has failed to introduce any direct evidence of a causal connection between her protected activity and her subsequent termination. The Court therefore applies the only standard by which Plaintiff could establish a causal connection: "that the protected activity was closely followed in time by the adverse [employment] action." *Reed*, 95 F.3d at 1178. While the Second Circuit has articulated no "bright line" rule for when an alleged retaliatory action occurs too far in time from the exercise of a federal right to be considered causally connected, *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001), it is well settled that when "mere temporal proximity" is offered to demonstrate causation, the protected activity and the adverse action must occur "very close" together, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). "[D]istrict courts within the Second Circuit

---

Plaintiff has only alleged, in her unsworn 56.1 statement, that she began an internal grievance process with the union; there is no admissible evidence in this regard.

have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases). Because the record reflects that Plaintiff raised her concerns about Olmeda's conduct in early 2000, less than two months before her subsequent receipt of the notification of her termination on March 29, 2000, the Court finds that the time period at issue in this case is close enough to meet Plaintiff's initial burden of demonstrating causation. Consequently, Plaintiff has met her *prima facie* burden regarding her retaliation claim.

### ii. Step Two

Turning to step two of the *McDonnell Douglas* analysis, Defendant has proffered admissible evidence, discussed above in support of its legitimate, non-retaliatory reasons for terminating Plaintiff.

### iii. Step Three

Finally, in the third step, the burden shifts back to Plaintiff "to show that the reason was merely a pretext for discrimination." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994). "A reason cannot be proved to be a pretext . . . unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases and internal quotation marks omitted). Nevertheless, "[s]ummary judgment is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000).

Proceeding to step three of the *McDonnell Douglas* analysis, the Court finds that there is insufficient evidence for a reasonable jury to conclude that Defendant's proffered reasons for terminating Plaintiff were actually a pretext for retaliation. While temporal proximity between Plaintiff's complaints and the termination decision infer causation at the *prima facie* stage, "mere temporal proximity" has been found by this Court to be insufficient to support a claim of retaliation at the summary judgment stage, at least where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor. *See Pierre v. New York State Dep't of Corr. Servs.*, No. 05 Civ. 0275 (RJS), 2009 WL 1583475, at *15 (S.D.N.Y. June 1, 2009); *Murray*, 528 F. Supp. 2d at 277 n.14; *see also, e.g.*, *Vosatka v. Columbia Univ.*, No. 04 Civ. 2936 (LAP), 2005 WL 2044857, at *10 (S.D.N.Y. Aug. 25, 2005) ("Although the sequence and timing of events, alone, creates an inference of discrimination sufficient to satisfy plaintiff's burden in the first step of the *McDonnell Douglas* analysis, . . . the timing of events alone, even if sufficient to meet the plaintiff's *prima facie* burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason." (internal quotation marks and citations omitted)) (collecting cases); *Smith v. Revival Home Health Care, Inc.*, No. 97 Civ. 4415 (RJD), 2000 WL 335747, at *7 (E.D.N.Y. Mar. 28, 2000) ("[M]ere temporal proximity cannot support a claim of retaliation."); *Chojar v. Levitt*, 773 F. Supp. 645, 655 (S.D.N.Y. 1991) (finding that the plaintiff could not refute employer's proffered reasons, and thus avoid summary judgment, by "merely pointing to the inference of causality resulting from the sequence in time of the events"). For the reasons discussed above, Plaintiff has failed to proffer sufficient evidence, beyond the temporal sequence of events, to support a finding that her termination was motivated

16

due to her participation in a protected activity. Accordingly, because the evidence as a whole is insufficient to sustain a reasonable finding that Defendant's proffered reasons for terminating Plaintiff are a pretext for retaliation, Plaintiff's retaliation claim is dismissed.

### D. Hostile Work Environment Claim

Plaintiff's hostile work environment claim is grounded on the conduct recited above in Part I.A.2.iii, which includes the slamming of doors, peeking, allegedly intimidating statements like "hm-hm," the rolling of eyes, the sucking of teeth, and the anonymous vandalism of Plaintiff's car. For the following reasons, the Court finds that this evidence is insufficient to support a reasonable determination in favor of Plaintiff's hostile work environment claim.

#### 1. Applicable Law

A hostile work environment, in violation of Title VII, is established when a plaintiff demonstrates that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998); *see Feingold*, 366 F.3d at 150; *Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003). Generally, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance . . . ." *Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788, (1998) (holding that "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment"); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester*, 171 F.3d 98, 100-01 (2d Cir. 1999) (holding that, to meet her burden, the plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice); *DelaPaz v. N.Y. City Police Dep't*, No. 01 Civ. 5416 (CBM), 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 30, 2003) (noting that "the Second Circuit erected a remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present in order to sustain . . . a [hostile environment] claim"). Although the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to state a claim, s*ee Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 439 (2d Cir. 1999) "[i]solated instances of harassment ordinarily do not rise to this level," *Cruz*, 202 F.3d at 570.

#### 2. Analysis

In this case, the Court finds that the alleged harassing comments and conduct fail to rise to the severe or pervasive level required to sustain a reasonable finding that Plaintiff's workplace was "permeated" with discriminatory intimidation. *See Howley*, 217 F.3d at 153. Much of the conduct enumerated by Plaintiff fails to constitute "discriminatory conduct." For example, nothing in the record links the following anonymous acts to

discrimination: (1) calling and hanging up on Plaintiff; (2) knocking on Plaintiff's office door; (3) opening and closing Plaintiff's door; (4) the vandalization of Plaintiff's car. While some of Olmeda's alleged conduct may reasonably be considered "discriminatory conduct," Olmeda's behavior is simply not sufficiently severe or abusive so as "to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Id.* For instance, the fact that "there w[ere] a few occasion[s] that [Plaintiff] had interacted with [Olmeda] in the corridor by [Olmeda] rolling her eyes at [Plaintiff], sucking her teeth at [Plaintiff], [and] brushing close by [Plaintiff]" (Galimore Dep. Tr. at 149; *see also id.* at 118) is not sufficient to sustain a hostile work environment claim. *Cf. James-Gray v. Hanes Hosiery, Inc., Div. of Sara Lee*, No. 95 Civ. 9950 (LMM), 1998 WL 525819, at *11 (S.D.N.Y. Aug. 21, 1998) (finding that it is "inconceivable" that allegations of racial harassment, such as a co-worker rolling her eyes at her or lack of direct communication with her are sufficient to support a hostile work environment claim). The four instances of Olmeda's race-related comments, which the Court has discussed extensively above, are likewise insufficient to sustain a claim for hostile work environment. *Cf. Negron v. Rexam Inc.*, 104 Fed. App'x. 768, 770 (2d Cir. 2004) (finding that co-worker's use of racial epithet "on a handful of occasions. . . including once over the loud speaker" was insufficient to establish hostile work environment); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *5, 8 (S.D.N.Y. Apr. 3, 2009) (finding that an employee referring to the plaintiff as "black ass" three times is not sufficient to show hostile work environment claim).

Moreover, the specific instances relayed by Plaintiff above are not sufficiently continuous and concerted to establish an objectively hostile work environment. *See, e.g.*, *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997))); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) ("[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; . . . to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."), *abrogated on other grounds by Nat'l R.R. Pasenger Corp. v. Morgan*, 536 U.S. 101 (2002). Plaintiff has failed to offer any admissible evidence regarding the frequency or the circumstances with which Olmeda made negative comments in Plaintiff's presence. (*See* Galimore Dep. Tr. at 90, 95); s*ee also Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 285 (S.D.N.Y. 2006) (finding that the "infrequency of [discriminatory insults] alone are insufficient to support [the plaintiff's] hostile work environment claim because 'isolated remarks or occasional episodes of harassment will not merit relief'" (internal citation omitted)).

In sum, although some of the conduct alleged by Plaintiff may be construed as offensive or inappropriate, it is not, taken as a whole under the circumstances of this case, sufficient to sustain a reasonable finding of a hostile work environment. In other words, after considering all of the conduct discussed *supra*, the Court finds that such conduct is insufficiently severe or pervasive as a matter of law to have "altered the conditions of [Plaintiff's] employment and create[d] an abusive working environment." *Feingold*, 366 F.3d at 149 (internal quotations and citations omitted). Consequently, summary

18

judgment is granted in favor of Defendant with respect to this claim.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 25 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: July 1, 2009
New York, New York

\* \* \*

Plaintiff is proceeding *pro se*. Defendant is represented by Kami Zumbach Barker, David Cheung, Jason Aaron Kroll, Shivani Soni, and Cindy E. Switzer, New York City Law Department, Office of the Corporation Counsel, 100 Church Street, New York, New York 10007.